## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| Brian J. Dorsey, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:24-cv-00198 |
| | ) | |
| Trevor Foley, Acting Director of the | ) | |
| Missouri Department of | ) | *This is a capital case;* |
| Corrections, Myles Strid, Acting | ) | *execution set for April 9, 2024.* |
| Director of Adult Institutions of | ) | |
| the Missouri Department of | ) | |
| Corrections, and Richard Adams, | ) | |
| Warden at the Eastern Reception, | ) | |
| Diagnostic and Correctional | ) | |
| Center in Bonne Terre, Missouri, | ) | |
| | ) | |
| Defendants. | ) | |

---

### Plaintiff Brian Dorsey's Complaint for Declaratory and Injunctive Relief Pursuant to 42 U.S.C. § 1983

---

Plaintiff, by and through respective counsel, hereby files this Complaint for Injunctive and Declaratory Relief, Attorney Fees, and Costs of Suit Pursuant to 42 U.S.C. § 1983 against Defendants Foley, et al. Plaintiff alleges and avers as follows.

### INTRODUCTION

1. Plaintiff Brian Dorsey brings this action to prevent violations of federal law and his fundamental rights under the United States Constitution.

2. Plaintiff Dorsey is a Christian and intends to have at his execution his spiritual advisor, Matthew Frierdich, an ordained minister in the United Church of Christ and Assistant Teaching Professor at University of Missouri Honors College.

3.   The State of Missouri intends to execute Plaintiff by lethal injection on April 9, 2024, at the Eastern Reception, Diagnostic and Correctional Center in Bonne Terre, Missouri, under conditions that violate: the First Amendment's Free Exercise Clause and substantially burden the exercise of his religion in violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et 1 seq.; the First, Fifth, Sixth, and Fourteenth Amendments protection of speech, access to counsel, and access to courts, and the Eighth Amendment's protection against cruel and unusual punishment. *See* Exhibits 1, 2.

4.   On January 26, 2024, Dorsey's legal team mailed and emailed general counsel for the Missouri Department of Corrections ("MDOC"), who promptly responded that the letter had been received. *See* Exhibit 3. The legal team then received an email from Gregory Goodwin of the Attorney General's office on January 31, 2024. Mr. Goodwin confirmed he had now received those communications and requested any further questions or concerns regarding MDOC or the lethal injection protocol to be sent to him exclusively, through email. *See* Exhibit 4.

5.   In this communication, Plaintiff requested: 1. His legal team to have access to a phone in the execution witness room, in order to effect meaningful access to counsel and the courts; 2. The use of appropriate, topical pain relief during the setting up of the IV lines, in order to allow for meaningful dialogue, prayers, and last rites with his spiritual advisor, a long-held and practiced tradition in both this country and in the Christian belief system Plaintiff Dorsey adheres to; and 3. The use of 500mcg of fentanyl before the injection of pentobarbital, as per the MDOC execution protocol, to prevent the cruel and unusual pain and anguish created by flash pulmonary edema. *See* Exhibit 3.

6.   There has been no response from the Attorney General to these questions as of the date of filing.

7.   Relief is necessary to ensure that Plaintiff Dorsey is executed only in a manner that does not substantially burden the exercise of his religious beliefs and does not violate his rights under the RLUIPA or the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.

### NATURE OF THE ACTION

8.  Plaintiff brings this action under 42 U.S.C. § 1983 for violations and
    threatened violations of his rights: to be free from cruel and unusual
    punishment under the Eighth and Fourteenth Amendments to the United
    States Constitution; to exercise his right to religious freedom and exercise
    under the First Amendment and the Religious Land Use and
    Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000 et seq.;
    and to free speech guaranteed by the First Amendment to the United States
    Constitution; to unhindered access to counsel and the courts and to petition
    the government for redress of grievances during the execution process under
    the First, Sixth, Eighth, and Fourteenth Amendments to the United States
    Constitution.

9.  Plaintiff seeks equitable, injunctive, and declaratory relief.

10. Defendants' policies, protocols, practices, customs, and procedures for
    executing Plaintiff's death sentence through lethal injection by setting up IV
    lines without ensuring any pain control or medication, which may be
    tantamount to conducting surgery on the plaintiff without any pain
    prevention, present a substantial risk of preventing plaintiff from having
    any meaningful spiritual discussion or participation in his last religious
    rites with his spiritual advisor at the time of execution, disrupting a long
    and deeply-held tradition that goes back centuries.

11. Defendants' policies, protocols, practices, customs, and procedures for
    executing Plaintiff's death sentence through lethal injection present a
    substantial risk of serious physical and psychological pain to Plaintiff, as
    well as an execution that will involve a torturous or lingering death, and/or
    an objectively intolerable risk of harm that Defendants' unjustifiably ignore,
    and such an execution will not accord with the "dignity of man" as required
    by well-settled principles of the Eighth Amendment.

12. The substantial risk of serious, torturous, physical and psychological pain
    that is not in accord with a dignified execution, in violation of Plaintiff's
    rights under the Eighth and Fourteenth Amendments, arises from
    Plaintiff's individual, unique physical characteristics and Defendants'
    execution policy, and/or the substantial likelihood of Defendants'
    maladministration of said execution policy including through deviations
    and/or variations from the written protocol's mandates. This includes, but is
    not limited to, the delivery mechanisms used, the personnel and training
    involved, the functional nonexistence of the written protocol's safeguards as
    administered, and the unfettered discretion granted in the policy to several
    of the official actors involved.

3

13. Plaintiff will be subject to a substantial risk of serious physical and psychological pain, as well as a torturous, lingering, and undignified execution, in violation of his rights under the Eighth and Fourteenth Amendments as a result of the sole use of pentobarbital in the policy.

14. Defendants' policies, protocol, practices, customs, and procedures will "superadd" pain and psychological torture as defined by the United States Supreme Court and prevailing federal law and will violate Plaintiff's rights under the Eighth and Fourteenth Amendment.

15. Defendants' policies, protocol, practices, customs and procedures violate Plaintiff's rights of meaningful access to counsel, and to the courts, and to petition the government for redress of grievances and for other constitutional relief as may be necessary during his execution, in violation of the First, Sixth, Eighth, and Fourteenth Amendments, including Plaintiff's rights protected by the Due Process Clause and the Privileges and Immunities Clause of § 1 of the Fourteenth Amendment.

16. Unless enjoined, Defendants intend to violate Plaintiff's constitutional rights by executing him using Defendants' execution policy.

17. The federal constitutional claims in this Complaint are cognizable under 42 U.S.C. § 1983. *Baze v. Rees*, 553 U.S. 35 (2008); *Hill v. McDonough*, 547 U.S. 573 (2006); *Nelson v. Campbell*, 541 U.S. 637 (2004).

18. Plaintiff seeks, among other relief, preliminary and permanent prohibitive injunctions under federal law preventing Defendants from executing him by means of their execution policy, including the written execution protocol effective October 18, 2013, or any formal and/or informal policies, practices, or customs which, as written and/or as used or administered, violate his federal constitutional rights.

19. Plaintiff also seeks, among other relief, preliminary and permanent prohibitive injunctions under federal law preventing Defendants from enforcing those provisions of their written execution protocol that violate Plaintiff's First Amendment rights to freedom of speech and freedom of religion, or those rights enumerated under RLUIPA.

20. Plaintiff seeks an expedited discovery process in order to factually establish that Defendants' execution policy as currently written and/or administered

violates his First, Fifth, Sixth, Eighth, and Fourteenth Amendments and federal law.

## JURISDICTION

21. This Court has jurisdiction under 42 U.S.C. §§ 2000cc-1, 28 U.S.C. §§ 1343, 1651, 2201, and 2202, and under 42 U.S.C. §1983.

## VENUE

22. Venue lies in this Court under 28 U.S.C. § 1391 because Defendants maintain offices in the Eastern District of Missouri. Venue is also proper because the execution will occur in this district.

## PARTIES

23. Plaintiff Brian Dorsey is incarcerated under a sentence of death at the Potosi Correctional Center in Mineral Point, Missouri. He is scheduled to be executed on April 9, 2024.

24. Defendant Trevor Foley is the Acting Director of the Missouri Department of Corrections. He is being sued in his official capacity.

25. Defendant Myles Strid is the Acting Director of Adult Institutions of the Missouri Department of Corrections. He is being sued in his official capacity.

26. Defendant Richard Adams is the warden at the Eastern Reception, Diagnostic and Correctional Center in Bonne Terre, Missouri, where Plaintiff Dorsey's execution will take place. He is being sued in his official capacity.

## PROCEDURAL HISTORY

27. Plaintiff Dorsey pleaded guilty and was sentenced to death in 2008 for the 2006 deaths of Sarah and Ben Bonnie. The Missouri Supreme Court affirmed Plaintiff's death sentences on direct appeal on July 16, 2010. *State v. Dorsey*, 318 S.W.3d 648 (Mo. 2010). The United States Supreme Court denied certiorari on November 29, 2010. *Dorsey v. Missouri*, 562 U.S. 1067 (2010).

28. Plaintiff Dorsey timely filed a petition for writ of habeas corpus in the federal district court for the Western District of Missouri. On July 26, 2018, the district court entered an order denying as procedurally defaulted one of the claims, and on September 27, 2019, the district court denied all remaining claims in the petition, denied an evidentiary hearing, denied expansion of the record, and denied a certificate of appealability on any issue.

29. Plaintiff Dorsey filed his Application for a Certificate of Appealability and the United States Court of Appeals for the Eighth Circuit issued an order granting a certificate of appealability in part. After oral argument, the Eighth Circuit issued its opinion denying Plaintiff relief on April 7, 2022. *Dorsey v. Vandergriff*, 30 F.4th 752 (8th Cir. 2022).

30. Plaintiff Dorsey filed his petition for a writ of certiorari on November 14, 2022. The Supreme Court of the United States denied certiorari, and, on that same date, the State of Missouri moved this Court to set an execution date for Plaintiff.

31. The Missouri Supreme Court issued an order and a warrant for execution on December 13, 2023, setting the execution date for April 9, 2024. *See* Exhibit 1.

32. Plaintiff Dorsey submitted a habeas petition pursuant to Missouri state law Rule 91 in the Missouri Supreme Court on December 22, 2023; it was officially accepted by that court on December 28, 2023. That petition, raising a Sixth Amendment violation by the Missouri Supreme Court in its disposition of Plaintiff's state habeas petition claims regarding his attorneys' conflict-of-interest and resulting ineffective assistance, remains pending. The State of Missouri has been asked to respond by February 13, 2024.

## CLAIMS FOR RELIEF

### Claims One and Two: Factual Background

33. Plaintiff Dorsey was raised a Christian. He is still a Christian. It is of paramount importance to his spiritual beliefs that his spiritual advisor, Rev. Dr. Matthew Frierdich, be present at the time of his execution to pray with

6

him and provide spiritual comfort and guidance in the final moments of his life. Dr. Frierdich has agreed to accompany Plaintiff in the execution chamber when he is executed, to pray with him and to help guide him into the afterlife. Dr. Frierdich needs to have meaningful conversation and mindful prayer with Plaintiff as Plaintiff makes peace in his final moments on this earth in accordance with both of their faith traditions.

34. The MDOC Protocol outlines the setting of IV lines for execution states:

> Medical personnel shall determine the most appropriate locations for intravenous (IV) lines. Both a primary IV line and a secondary IV line shall be inserted unless the prisoner's physical condition makes it unduly difficult to insert more than one IV. Medical personnel may insert the primary IV line as a peripheral line or as a central venous line (e.g., femoral, jugular, or subclavian) provided they have appropriate training, education, and experience for that procedure. The secondary IV line is a peripheral line.

> *See* Exhibit 2.

35. The policy says nothing about any kind of pain relief, any limits on the number of failed IV-line insertions, any time limits on how long attempts may go on, or any limits on what procedures may be used to establish IV lines.

36. Appropriate "training, education, and experience" is also not defined. MDOC employees have unfettered ability to cause physical pain and mental anguish during IV-line placement. *See* Exhibit 5, Report from Dr. Gail A. Van Norman, M.D., Anesthesiologist, pgs. 23, 6 (finding that complications, many of which result in excruciating pain, "are significantly affected by the experience of the person placing the line" and that complications include "severe or excruciating pain from injection of barbiturate into tissues other than veins, and/or prolongation of the execution process due to incomplete delivery of drug into the vein.").

37. There is no ability for Plaintiff Dorsey's legal team to monitor IV-line placement to ensure appropriate procedures and safeguards are in place, and attorneys are unable to meet with Plaintiff after IV lines have been placed but before Plaintiff meets with his spiritual advisor.

38. Prohibiting Plaintiff Dorsey's access to counsel after IV lines have been placed but before he has his final moments with his spiritual advisor puts Plaintiff's ability to engage in his faith practices at significant risk without recourse.

39. Upon information and belief, MDOC employees who are setting the IV lines are resorting to using "cut downs," a procedure wherein the person establishing the IV line cuts into the flesh of a condemned person, and "large incisions are made in the arms, legs or other areas, the tissue is dissected with a scalpel down to a vein, and the catheter is placed in the exposed vein." Van Norman at 6.

40. Cut downs are a surgical procedure and cause "excruciating pain," yet, upon information and belief, no pain control or anesthetic is given. *See* Van Norman at 6. Given that cut-downs should never be necessary to establish IV lines if those establishing those lines were appropriately trained, they are certainly never required without inexpensive, readily-available pain relief. *See* Exhibit 6, Report from Dr. Craig Stevens, Professor of Pharmacology, pgs. 9-10.  Thus, the practices of MDOC "superadd" pain. *Bucklew v. Precythe*, 139 S.Ct. 1112, 1124 (2019).

41. These unnecessary and un-anesthetized surgical procedures are committed before a condemned person meets with their spiritual advisor for the final time. Therefore, the extreme pain that a condemned person is in inhibits their ability to fully participate in their faith and engage in prayer and other religious or spiritual acts before execution. *See* Van Norman at 6, explaining that Plaintiff will meet with his spiritual advisor already in "significant pain from protracted IV access attempts and cutdowns".

42. This is not speculative. Upon information and belief, at least one condemned person in Missouri was forced to meet with their spiritual advisor to undertake last rites before death already in severe pain and distress due to cut down and inexpert IV-line placement.

43. Given the vagueness of the protocol, the lack of limits or safe practices in IV-line placement, and the use of cut downs, Plaintiff Dorsey will be in significant pain and anguish when meeting his spiritual advisor for the final time.

**CLAIM ONE: FIRST AMENDMENT FREE EXERCISE OF RELIGION**

44. Plaintiff Dorsey incorporates by reference each and every statement and allegations set forth through this Complaint as if fully stated herein.

45. The First Amendment requires that "Congress shall make no law ... prohibiting the free exercise of" religion. U.S. Const., amend. I. Like the Establishment Clause, the Free Exercise Clause is binding on the states. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (holding that the protections of the Free Exercise Clause are incorporated by the Fourteenth Amendment against the States).

46. MDOC's lack of policy or practice ensuring that Plaintiff has meaningful access to spiritual counseling during the moments leading up to and including his execution violates his First Amendment rights under the Free Exercise clause and cannot be justified by any medical or security concerns. Furthermore, MDOC cannot demonstrate that its current protocol or practices, that do not provide for pain relief before or after cutting into Plaintiff, are required to ensure any legitimate purpose.

47. MDOC's current policy regarding the placement of IV lines with no limits on the number of failed attempts, surgery, pain and anguish that will be inflicted and no requirement for appropriate pain relief burdens Plaintiff 's free exercise of his Christian faith in the moments just prior to and including his execution. It burdens his free exercise of faith at his exact time of death, when most Christians believe they will either ascend to heaven or descend to hell; in other words, when religious instruction and practice is most needed, and Christians are commanded to pray. *See, e.g.*, James 5:13-15 ("Are any among you suffering? They should pray. [ ] Are any among you sick? They should call for the elders of the church and have them pray over them, anointing them with oil in the name of the Lord. The prayer of faith will save the sick, and the Lord will raise them up, and anyone who has committed sins will be forgiven."); 2 Timothy 1:6 ("[I] remind you to rekindle the gift of God that is within you through the laying on of my hands") (all Biblical quotes from New Revised Standard Version).

48. When a state hinders a prisoner's ability to freely exercise his religion, reviewing courts must determine whether a government entity has burdened a sincere religious practice pursuant to a policy that is not

"neutral" or "generally applicable." *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879–881 (1990). If it is not neutral and generally applicable, the law must pass strict scrutiny, under which the state must demonstrate its policy or practice is justified by a compelling governmental interest that is narrowly tailored to further that interest. See, *e.g., Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

49. Here, MDOC's policy is not neutral. It is hostile toward religion, denying religious exercise at the precise moment it is most needed: when someone is transitioning from this life to the next. The Supreme Court has rejected the argument that States may keep spiritual advisors out of the execution room and prevent prayer and the laying on hands at the moment of passing when such a policy fails to further compelling government interests. *See Ramirez v. Collier*, 595 U.S. 411, 430-34 (2022). MDOC is committing the functional equivalent of removing Plaintiff Dorsey's spiritual advisor by denying Plaintiff spiritual guidance and comfort from his advisor in the last moments of his life by rendering Plaintiff unable to meaningfully participate in his faith practices.

50. Further, cutting into a person to establish an IV line is only required when those setting the IV line are poorly trained and lack experience or are simply inpatient. It is almost never required. But to do so unnecessarily without pain control before a person's last rites in accord with their sincerely held religious beliefs can only be punitive towards a person's free exercise rights.

51. The policy and practices are also not generally applicable. Plaintiff Dorsey is morbidly obese. It is exceedingly likely that establishing IV lines will be considerably more difficult and therefore require "cut-downs," which amount to a surgical procedure without any pain relief. Plaintiff is in danger of losing his ability to participate in his faith at the moment of his death simply because of the size of his body.

52. As it is not generally applicable nor neutral, the policy is thus permissible only if it can survive strict scrutiny. It cannot. Not only is there is no "compelling governmental interest" in causing excessive pain to a patient that results in the functional denial of spiritual guidance, such a practice regarding the IV line placement runs contrary to MDOC's policy regarding

spiritual advisors. MDOC seemingly recognizes the long-historical and deeply humane tradition of allowing spiritual advisors to be present, lay hands and pray over them at the moment of their death. The spiritual advisor policy understands and respects a condemned person's First Amendment right to free exercise of religion. Yet the single paragraph regarding IV line placement fails to ensure a condemned person may take advantage of that right. The policy ensuring religious liberty is rendered meaningless if a condemned person may not participate as fully as their faith requires because MDOC's IV practices cause severe pain and suffering prior to and during the time when those faith practices can occur. The policy and practice cannot withstand each other, let alone strict scrutiny, as the Constitution requires.

53.    Further, Plaintiff comes from a faith that believes that spiritual guidance is of utmost importance after another commits a sin against his body, such as cutting into his flesh, before he passes. "You are children of the Lord your God. You must not lacerate yourselves or shave your forelocks for the dead. For you are a people holy to the Lord your God; it is you the Lord has chosen out of all the peoples on earth to be his people, his treasured possession." (Deuteronomy 14:1-2). The act of cutting into Plaintiff without pain relief, such that he cannot meaningfully engage with his spiritual advisor afterwards, deprives Plaintiff of the opportunity to reconcile the act done against his flesh before his death, as well as his own acts and the taking of life.  *See, e.g.*, Ephesians 4:32 ("[A]nd be kind to one another, tenderhearted, forgiving one another, as God in Christ has forgiven you."); Hebrews 12:13 ("Pursue peace with everyone, and the holiness without which no one will see the Lord.").

54.    There is simply no government interest in mutilating Plaintiff Dorsey's flesh, the result of ignorance, lack of training, or lack of patience. There is no government interest in denying the appropriate pain relief before such mutilation. Whereas the burdens on Plaintiff are ones of the greatest spiritual importance, the disposition of his immortal soul.

55.    The State must not render Plaintiff "unable to engage in protected religious exercise in the final moments of his life" in the absence of any governmental interest. *Ramirez*, 595 U.S. at 433. As such, the State will violate Plaintiff's First Amendment right to Free Exercise, and the execution protocol, as written and as applied, is unconstitutional.

56. Further, Plaintiff must have access to counsel after IV lines have been established, but before he meets with his spiritual advisor, in order to exercise his right of access to the courts should the State deny him his sincerely held faith practices and his First Amendment and RLUIPA rights to religious free exercise.

57. A preliminary injunction is appropriate here, as Plaintiff Dorsey can "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). As the Supreme Court has noted, those like Plaintiff who are denied their religious practices during execution are "likely to suffer irreparable harm in the absence of injunctive relief because he will be unable to engage in protected religious exercise in the final moments of his life. Compensation paid to his estate would not remedy this harm, which is spiritual rather than pecuniary." *Ramirez*, 595 U.S. at 433.

58. And because Plaintiff does not seek an open-ended stay but a tailored injunction requiring Missouri to provide pain medication before their employees perform an unnecessary surgical procedure so that Plaintiff may engage in his deeply held faith practices, the balance of equities and public interest tilt in favor of Plaintiff. *See id.*

## CLAIM TWO: THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT (RLUIPA)

59. Plaintiff Dorsey incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully stated herein.

60. Even if this Court finds that MDOC's practice of using cut-downs and withholding any pain relief does not violate Plaintiff Dorsey's First Amendment rights, it should find that the policy violates RLUIPA. RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing  in or confined to an institution"— including state prisoners—"even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the

12

burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).

61. RLIUPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc–5(7)(A).

62. Plaintiff Dorsey bears the initial burden of proving that the prison practice here "implicates his religious exercise," the prison's actions are a substantial burden on Plaintiff's religious exercise, and the requested accommodation is "sincerely based on a religious belief". *Holt v. Hobbs*, 574 U.S. 352, 360-61 (2015).

63. Once a plaintiff makes such a showing, the burden flips and the government must "demonstrate[ ] that imposition of the burden on that person" is the least restrictive means of furthering a compelling governmental interest. § 2000cc–1(a); *see also* Holt, 574 U.S. at 362.

64. As RLUIPA is "an obvious effort to effect a complete separation from the First Amendment case law, Congress deleted reference to the First Amendment and defined the 'exercise of religion' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 696 (quoting 42 U.S.C. § 2000cc-5(7)(A)). RLUIPA thus provides more "expansive protection" for religious liberty than First Amendment precedent. *Holt*, 574 U.S. at 358.

65. Plaintiff can meet that initial burden. Indeed, his faith has a long and storied tradition in this country, as the Supreme Court noted in *Ramirez,* 595 U.S. at 427-28, recounting the "rich history of clerical prayer at the time of a prisoner's execution, dating back well before the founding of our Nation." (discussing the tradition reaching back to England and pointing out that even some of history's most despised condemned men, including those who murdered Abraham Lincoln and the Nazis convicted at Nuremberg, were able to engage in faith practices before and during execution).

66. Plaintiff was raised with Christian scripture in a Christian church. He grew up hearing the verse, "Watch and pray so that you will not fall into temptation. The spirit is willing, but the flesh is weak." (Matthew 26:41). He learned that the context for the statement was just prior to Jesus's

crucifixion; Jesus' body has been anointed with perfume, He has eaten His last meal, and He is in the Garden of Gethsemane, where He asks his friends to keep watch with him while He prepares for what is to come. His friends, however, fall asleep. He addresses Peter and says, "Couldn't you men keep watch with me for one hour?" and admonishes him with the above scripture. Jesus leaves His friends to keep praying, but He is full of sorrow. Jesus was asking his disciples to stay awake, to simply be fully present and prayerful with Him unto death. Plaintiff wishes to engage in the same mindful, committed, purposeful prayer before his death as Jesus wished to engage in before His.

67. In addition to scripture verses cited elsewhere in this Complaint which are incorporated here by reference, it is part of Plaintiff's sincerely held religious beliefs to seek assurance from his spiritual advisor regarding his mindset at the moment of his execution, as that affects his status to receive forgiveness and mercy from God such that he will ascend to heaven upon his death. *See, e.g.*, Matthew 5:7–8 (recounting Jesus's teaching that "Blessed are the merciful, for they will receive mercy. Blessed are the pure in heart, for they will see God."); Matthew 5:43–45 ("You have heard that it was said, 'You shall love your neighbor and hate your enemy.' But I say to you, Love your enemies and pray for those who persecute you, so that you may be children of your Father in heaven"); Matthew 6:14–15 ("For if you forgive others their trespasses, your heavenly Father will also forgive you; but if you do not forgive others, neither will your Father forgive your trespasses."); Romans 12:14 ("Bless those who persecute you; bless and do not curse them.").

68. However, committing one's immortal soul to God and following scriptural teachings in order to ascend to heaven after death is substantially burdened when the pain of the flesh inflicted via the cut-down method is unbearable. As stated in Dr. Van Norman's report, Plaintiff Dorsey will be in "significant pain from protracted IV access attempts and cutdowns" before he is able to meet with his spiritual advisor to perform his faith's final rites. Van Norman at 6.

69. Prohibiting Plaintiff from engaging in his sincerely held religious beliefs and vitally important religious practices with his spiritual advisor at the end of his life, including the moment of his death, substantially burdens his practice of religion. See, e.g., *Holt*, 574 U.S. at 358 (determining that where a prisoner shows the exercise of religion "grounded in a sincerely held

religious belief," enforced prohibition "substantially burdens his religious exercise").

70. Yet RLUIPA prohibits a prison from imposing a substantial burden on a prisoner's religious exercise unless doing so satisfies strict scrutiny, a standard which is "exceptionally demanding." *Holt*, 574 U.S. at 353 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. at 728). Further, both strict scrutiny and RLUIPA require the challenged policy to be "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. §2000cc-l(a).

71. Defendants have not employed the least restrictive means to further a compelling governmental interest. It is unlikely they will even be able to point to a governmental interest in cutting into the flesh of condemned people due to the inexperience or ignorance of staff without any pain assistance. And under the strict scrutiny standard that the Supreme Court has held applies in this situation, Defendants have the burden to prove this defense. *See Holt*, 574 U.S. at 357, 362.

72. MDOC's policy and practice places a substantial burden on Plaintiff 's practice of a sincerely held religious belief in the necessity of reconciliation, prayer, and recommitment to God in the final moments of his life, when religious observance and spiritual guidance are most critical. No compelling State interest justifies the burden on his religious exercise.

73. Accordingly, if the Court concludes that MDOC's policy and practice do not violate the First Amendment, it should decide that these acts violate RLUIPA and for the reasons stated above in Claim One grant a preliminary injunction.

## Claim Three: Factual Background

74. Upon information and belief, Mr. Dorsey will be transported from Potosi Correctional Center in Mineral Point, Missouri, to the execution site at Eastern Reception, Diagnostic and Correctional Center ("ERDCC") in Bonne Terre, Missouri, the weekend before the scheduled execution date, April 9, 2024.

75. Upon information and belief, ERDCC staff will monitor Mr. Dorsey's legal visits with counsel after Mr. Dorsey's arrival at ERDCC. Mr. Dorsey will not, in other words, have confidential communication with counsel after his arrival at ERDCC.

76. Mr. Dorsey's contact with counsel at ERDCC will be cut off at 11 a.m. on the morning of the scheduled execution date. That is, Mr. Dorsey will not have direct contact with counsel again after 11 a.m., April 9, 2024.

77. Upon information and belief, direct oral communication will not be possible between Mr. Dorsey in the execution chamber and counsel inside the witness room.

78. Upon information and belief, there is a phone available to Mr. Dorsey's counsel outside the witness room at ERDCC. There is no phone available for counsel's use inside the witness room.

79. In the event of an emergency during the execution attempt, counsel would therefore be required to leave the witness room to use the only phone available to counsel to access the outside world, including the courts.

80.  Upon information and belief, counsel is not permitted to leave the witness room once the execution has started, effectively severing Mr. Dorsey's access to the courts.

81. Even if counsel were permitted to leave the witness room in the event of an emergency, counsel would be unable to relay events over the phone to a judge in real time because counsel would not be in the witness room to observe what was happening.

82. On January 26, 2024, counsel reached out to MDOC's general counsel and proposed that counsel be permitted access to a phone inside the witness room to remedy the above deficiencies. Counsel proposed that the phone be an internal landline connected to another member of Mr. Dorsey's legal team located in another part of ERDCC on open line with the courts and state. As stated above, the Attorney General is currently representing the institution and has not responded with answers at this time.

**CLAIM THREE: VIOLATIONS OF FIRST, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS OF ACCESS TO COUNSEL, ACCESS TO COURT, AND DUE PROCESS**

83. Plaintiff Brian Dorsey incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully stated herein.

84. An execution is the final, critical state of a criminal proceeding. As proven by problematic executions in several of the states, an execution is a critical event at which the condemned inmate must have counsel at the ready to advocate on his behalf in the event something goes awry. Put differently, Plaintiff Dorsey has a right to access the courts before and during the execution attempt and that right necessarily depends on Plaintiff's right of access to counsel before and during the execution attempt.

85. In this regard, Defendants' execution policy does not allow for Plaintiff's unhindered access to counsel before and during the execution, even in the event problems develop during the execution.

86. Plaintiff Dorsey must have some manner of access to counsel before and during his execution, especially in the event problems develop during the execution, because meaningful exercise of Plaintiff's right of access to the courts necessarily depends on his access to counsel.

**Defendants place impermissible conditions on Plaintiff's constitutional rights**

87. Defendants' execution policy arbitrarily, irrationally, and without a compelling state interest, denies Plaintiff Dorsey the unhindered right to have his counsel present to witness Plaintiff's execution and to represent Plaintiff's interests, *i.e.*, by exercising Plaintiff's right of access to the courts in the event that the execution attempts goes awry.

88. Just as Defendants have counsel and/or the Missouri Attorney General present at an execution, and as set forth in fuller detail below, Plaintiff Dorsey is entitled to have his counsel present as a witness to ensure that he has an advocate present to represent his interests if something goes wrong during the execution.

17

89. By imposing this burden on Plaintiff Dorsey, Defendants' execution policy places impermissible conditions or restrictions on Plaintiff's rights: to free speech; to access the courts; to petition the government for redress of his grievances; to be free from cruel and unusual punishment; to the privileges or immunities guaranteed to citizens of the United States including the rights to come to the seat of government by way of counsel to assert any claim he may have upon the government, to free access to the courts of justice, and to petition for redress of his grievances; and to due process. These rights are protected by the First, Sixth, and Eighth Amendments, as well as by the Privileges or Immunities Clause and the Due Process Clause of § of the Fourteenth Amendment.

**Defendants deny Plaintiff Dorsey's constitutional rights by denying him unhindered access to counsel, which also denies Plaintiff his right of access to the courts**

90. Defendants' execution policy arbitrarily, irrationally, and without a compelling state interest, denies Plaintiff Dorsey the right of access to counsel and/or to communicate with counsel so that counsel may give effect to Plaintiff's constitutional rights before and during his attempted execution.

91. Only through the advocacy of counsel will Plaintiff Dorsey be able to assert his constitutional rights of access to the federal and/or state courts and to petition the authorities – including but not limited to the Governor of Missouri and the Supreme Court of Missouri – for redress of Plaintiff's grievances if problems arise before or during his attempted execution.

92. Upon information and belief, MDOC Defendants and/or their agents monitor/listen to and document communications between a condemned inmate and counsel during attorney-client visits the evening before the scheduled execution and the morning of the scheduled execution, regardless of the circumstances of any particular execution or condemned inmate.

93. Thus, Defendants will not allow for confidential communication between Plaintiff Dorsey and counsel at any time when Plaintiff is at Bonne Terre/ERDCC.

94. Upon information and belief, an inmate's access to counsel and the inmate's ability to communicate with counsel is cut off at 11:00 a.m. on the morning of the scheduled execution.

95. Upon information and belief, an inmate may not communicate with others outside the death chamber – including counsel – after being led into the death chamber.

96. Upon information and belief, an inmate who needs to convey anything to counsel from the death chamber during the execution must either mouth his statements for counsel to lip-read or else raise his voice so loudly that the inmate can be heard through the wall and glass window separating the witness room and the death chamber.

97. Defendants provide no mechanism by which Plaintiff Dorsey can be assured functional access to counsel and receive counsel's assistance in the event that Defendants' attempt to execute him begins to go awry or to subject Plaintiff to unconstitutional harm. That is:

   a. Defendants provide no mechanism by which counsel can communicate directly with those Defendants in the death chamber and/or the equipment room who are responsible for carrying out the execution;

   b. Defendants provide no mechanism by which Plaintiff's counsel can communicate directly with the federal and/or state courts or other governmental official in the event that Defendants' attempt to execute Plaintiff begins to go awry or to subject Plaintiff to unconstitutional harm, when time is of the essence;

   c. Specifically, Defendants do not provide for counsel's access to a telephone inside the execution witness room. Should counsel need to exercise Plaintiff Dorsey's right of access to the state or federal courts, or others able to stop the execution, such as the Governor of Missouri, counsel would be forced to leave Plaintiff Dorsey's presence, thus denying Plaintiff the ability to convey anything to counsel (*e.g.*, even if by gesture, movement, or facial expression) at this critical juncture.

98. Upon information and belief, moreover, Defendants do not permit counsel to leave the witness room once the execution has started. Counsel is literally locked inside the witness room. Thus, in the event of an emergency, counsel will not be able to communicate her observations from the witness room to the outside world. Thus, by prohibiting counsel from leaving the witness room, Defendants deprive Plaintiff Dorsey of his rights of access to both counsel and the courts because counsel is the means by which Plaintiff

exercises his right of access to the courts, *i.e.*, by having counsel communicate with the courts.

99. Even if counsel were permitted to leave the witness room, there would be a substantial lapse of time from when counsel observes a problem with the execution, attempts to consult with her client, leaves the execution witness room and Plaintiff Dorsey's presence, and establishes contact with the outside world to, *e.g.*, have access to the court and communicate to a judge in real time what is occurring.

100. This lengthy period of time is critical in the event that problems arise in the execution process and counsel must attempt to notify the courts or other governmental figures to halt the proceedings.

101. Thus, even if counsel were permitted to leave the witness room in the event of an emergency, the delay caused by Defendants' execution policy would still deprive Plaintiff Dorsey of either or both his right of access to counsel and his right of access to the courts and/or his right to petition the applicable authorities to seek redress of his grievances.

102. Counsel must have available means to communicate with those persons responsible for the execution, and the courts as well, in such a way that does not force Plaintiff Dorsey to choose between his right to have counsel present at the execution and to access the courts or to petition for redress of his grievances.

103. Narrowly tailored solutions exist that will not delay the execution and will promote and protect the State's safety and security concerns, Plaintiff Dorsey's rights by ensuring access to courts and counsel, preventing any unnecessary delay or *ex parte* requests from either side, and ensuring the integrity and constitutionality of the execution. *See* Exhibit 7, Declaration from Mr. Allen L. Bohnert, Assistant Federal Public Defender, Capital Habeas Unit, Federal Public Defender for the Southern District of Ohio at 3-6.

104. In all the foregoing ways, Defendants deny Plaintiff Dorsey's rights protected by the First, Sixth, and Eighth Amendments to the United States Constitution, as well as by the Privileges and Immunities Clause and the Due Process Clause of § 1 of the Fourteenth Amendment to the United

States Constitution, including the right: to free speech; to access the courts; to petition the government for redress of his grievances; to be free from cruel and unusual punishment; to the privileges or immunities guaranteed to citizens of the United States including the rights to come to the seat of government by way of counsel to assert any claim he may have upon the government, to free access to the courts of justice, and to petition for redress of his grievances; and to due process.

## CLAIM FOUR: FOURTEENTH AMENDMENT EQUAL PROTECTION VIOLATIONS

105. Plaintiff Dorsey incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully stated herein.

106. Equal protection under the law requires "minimal procedural safeguards" such that there is at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.

107. The Equal Protection Clause's rudimentary requirements are important here, where the Supreme Court has clearly emphasized the necessity of procedural safeguards in a state's lethal injection policy, especially including the written protocol, to ensure against Eighth Amendment and Fourteenth Amendment violations.

108. The rudimentary requirements are also important when access to counsel is necessary to effectuate Plaintiff Dorsey's First, Sixth, Eight, and Fourteenth Amendment rights involving access to the courts and the ability to seek redress of grievances from the appropriate governmental official during Plaintiff's execution, including his rights guaranteed by the due process and privileges or immunities clause of the Fourteenth Amendment.

109. Plaintiff Dorsey has fundamental rights, which Defendants are violating, to access his counsel to access the courts, to petition for redress of grievances, to the privileges or immunities guaranteed by United States citizenship, and to due process, which rights are protected under the First, Sixth, Eighth, and/or Fourteenth Amendments.

### Claim Five: Factual Background

**Pentobarbital**

110. The Protocol calls for execution by administration of "[f]ive (5) grams of pentobarbital (under whatever name it may be available from a manufacturer, distributor or compounding pharmacy)." The Protocol provides that the pentobarbital be divided between two syringes, and that the administration be followed by a saline flush. In the event that the first dose of five grams of pentobarbital does not cause the prisoner's death, the Protocol provides that a second dose of five grams be administered, followed by a saline flush.

111. Pentobarbital is a barbiturate that affects the activity of the brain and nervous system. It is clinically indicated for use as a sedative and for treatment for epilepsy and brain-swelling. *See* Van Norman at 7.

112. Barbiturates, including pentobarbital, "do not guarantee unconsciousness." *Id*. at 5, 15. Pentobarbital produces only unresponsiveness, not unconsciousness nor lack of awareness. "[I]t is extremely likely that prisoners given even high doses of barbiturates retain consciousness long enough to experience pain and suffering during the execution process using single-drug pentobarbital." *Id*. at 5. It is extremely likely prisoners administered 5 grams of pentobarbital will remain sensate and will feel the effects of the execution, "even when [they] appear to be unconscious by all clinical measures and are unresponsive." *Id*.

113. Injection of a large dose of pentobarbital, including 5 grams, as required by the Protocol, will cause "flash" or non-cardiogenic pulmonary edema – fluid in the lungs – in "virtually all" executions. *Id*. at 5, 19. Flash or acute pulmonary edema is a "process in which fluid from the bloodstream floods the lungs, causing failure of the lungs to transfer sufficient oxygen into the bloodstream." *Id*. at 19. Flash pulmonary edema involves "direct toxic/caustic damage to the lung capillaries as extremely high concentrations of barbiturates (which are highly alkaline and caustic) make physical contact with the lung and capillary surfaces, causing immediate leakage of fluid through the damaged capillaries into the lungs." *Id*. at 20. Flash or non-cardiogenic pulmonary edema is distinguished from cardiogenic pulmonary edema, which occurs much more gradually when fluid backs up in the lungs as a result of heart failure.

114. Flash pulmonary edema will produce foam or froth in the lower and upper airways (the bronchi and trachea).  As a result, flash pulmonary edema

causes "obstruction or partial obstruction of the upper airway due to effects of barbiturates on respiratory centers in the brain, or due to laryngospasm (a spasmodic, involuntary closure of the larynx) while respiratory efforts continue against the obstruction or partial obstruction, 'sucking' fluids from the capillaries into the lung air spaces ('negative pressure' pulmonary edema)." *Id.* Pulmonary edema also involves "acute left heart failure due to direct toxic effects of barbiturates on the heart, leading to 'backing up' of blood into the lungs." *Id.*

115. "Onset of pulmonary edema following IV barbiturate injection can be *virtually instantaneous.*" *Id.* (emphasis in original). The experience of acute pulmonary edema prior to the loss of consciousness can include "cough, shortness of breath, air hunger, rapid breathing, sweating, falling levels of oxygen in the bloodstream, frothy sputum (sometimes pink or red due to blood) or fluid in the airway, and acute excruciating sensations of doom and/or drowning." *Id.* at 19. The experience is excruciating:

> Not being able to breathe during drowning or asphyxiation is one of the most powerful, excruciating feelings known to man. It is nearly impossible for most untrained human beings to hold their breath voluntarily for more than 1 minute. In less than 60 seconds, sensations of asphyxia and compulsion to breathe appear and rapidly overwhelm the brain. Panic and terror, and the attempt to fight take over. *Even human beings who are underwater will reach such a level of agony that they will be compelled to take a "breath" within about 1 minute.* This is the sensation that is deliberately elicited in "the enhanced interrogation technique" called waterboarding, which is defined by the European Court of Human Rights as a form of torture.

*Id.* at 21 (citations removed; emphasis in original). Moreover, because pentobarbital causes unresponsiveness, not unconsciousness, in the condemned prisoner, "as the prisoner begins to experience suffocation and the sensations of drowning with flash pulmonary edema . . . they will become progressively more aware" of the experience. *Id.* at 11.

116. Flash pulmonary edema occurs "virtually immediately during and after high-dose barbiturate injection," and well within the time frame for pentobarbital to carry out its peak effects on the brain. *Id.* at 22. It is "extremely likely" that prisoners "retain consciousness long enough to experience pain and suffering during the execution process." *Id.* at 5. "It is

a virtual medical certainty that most, if not all, prisoners will experience excruciating suffering as a result of experiencing sensations of drowning and suffocation due to the effects of IV injection of 5 grams of pentobarbital." *Id.*

117. A review of 32 autopsy reports from executions using barbiturates revealed that all the executed prisoners exhibited "pulmonary congestion, pulmonary edema, bloody froth in the airways, and fluid in the airways, which are not normal autopsy findings." *Id.* at 22.  The autopsy reports documented the presence of moderate to severe pulmonary edema, including "fluid filling in the main airways (indicating severe pulmonary edema)." *Id.*  The presence of fluid in the main airways of executed prisoners tells us that the prisoners were alive when the flash pulmonary edema occurred, because flash pulmonary edema "requires the presence of a beating heart, to create pressure to drive that fluid into the lungs." *Id.* It is a "virtual medical certainty that immediate, flash pulmonary edema occurred in the prisoners" executed with barbiturates and that "they were aware and experienced sensations of drowning and suffocation as they died." *Id.*

118. The Protocol lacks sufficient detail in several areas, including the necessary qualifications for execution personnel; how execution personnel are selected; pre-execution preparation, including assessment of the condemned prisoner for relevant medical and venous access issues; the source, form and handling of the execution drug; requirements and details for IV placement and IV administration of the pentobarbital; what equipment will be used, and what equipment should be available; and contingency planning.

119. The Protocol says the "execution team consists of department employees and medical personnel including a physician, a nurse, and pharmacist. The execution team also consists of anyone selected by the department director who provides direct support for the administration of lethal chemicals, including individuals who prescribe, compound, prepare, or otherwise supply the chemicals for use in the lethal injection procedure." The Protocol provides no criteria for execution personnel and no requirements for their skills, training, experience, licensure or current practice. The Protocol provides no information on how execution personnel are selected, beyond that they are "selected by the department director." The Protocol should "state the skills, training and experience necessary for personnel who obtain intravenous (IV) access, monitor intravenous line function. . . and obtain

alternate venous access if necessary, including central venous access via the jugular vein, femoral vein cut-down or other procedures." Van Norman at 26.

120. The Protocol does not require evaluation or consideration of the condemned prisoner's health and medical condition, including consideration of any medications the prisoner may be taking that could impact his venous access and responsiveness to pentobarbital.

121. The Protocol does not provide necessary safeguards to ensure that the pentobarbital Defendants obtain and use in executions will meet minimum standards of purity and potency and functions as intended. The problems attendant to the use of pentobarbital as an execution agent are significantly exacerbated if the drug is contaminated, impure, sub-potent, or otherwise does not meet quality control standards, including if the pentobarbital has an unusually high pH, has expired, or is past its beyond use date. If the pentobarbital fails to meet even just one of these standards, it could fail to exert the expected pharmacological effect, this increasing the likelihood that the condemned prisoner would experience substantial pain and suffering.

122. The Protocol contains no provisions, requirements, criteria, or safeguards regarding the methods for obtaining, storing, mixing, and appropriately labeling the pentobarbital, the chain of custody for the pentobarbital, the minimum qualifications and expertise required for the person who will determine the concentration, dosage and rate of infusion for its administration. It instead provides unfettered, unguided discretion.

123. The Protocol contains no provisions, requirements, criteria, or safeguards regarding the form and provenance of the pentobarbital to be used, instead allowing for the use of "pentobarbital (under whatever name it may be available from a manufacturer, distributor or compounding pharmacy)." This means the pentobarbital used in any execution could be a manufactured, FDA-approved product, a compounded product made by a loosely or unregulated compounding facility, or some other type of pentobarbital product, and neither Plaintiff, nor the courts have any way of knowing what the makeup of the pentobarbital actually will be for any given execution.

124. The Protocol contains no provisions, requirements, criteria, or safeguards regarding testing of the pentobarbital to be used to ensure it meets even minimal requirements, such as identity (is it, in fact, pentobarbital), purity and potency. Because the Protocol lacks any requirements for testing of the pentobarbital, it also lacks any requirement that the results of such testing be communicated promptly and prior to the execution to condemned prisoners facing execution, their counsel, and the Court, and it lacks any requirement that any pentobarbital that fails any quality control test not be used in an execution.

125. The Protocol states, "Medical personnel shall determine the most appropriate locations for intravenous (IV) lines. Both a primary IV line and a secondary IV line shall be inserted unless the prisoner's physical condition makes it unduly difficult to insert more than one IV. Medical personnel may insert the primary IV line as a peripheral line or a central venous line. . . provided they have the appropriate training, education, and expertise for that procedure. The secondary IV line is a peripheral line." However, the Protocol does not call for a vein assessment of the prisoner prior to an execution so the execution team will not have the necessary information to select the most appropriate locations to place IV catheters, and they will not know whether the prisoner's conditions will make it difficult to insert more than one IV. The Protocol does not require that medical personnel on the execution team possess the appropriate training, education and expertise to place central IV lines and provides no information about who will maintain such information, if it is gathered at all.

126. The Protocol provides no information about what size IV catheters should be placed in a prisoner's peripheral or central vein and does not list any of the equipment required to be on-hand for the execution team members to establish IV access and perform their many other tasks.

127. The Protocol requires that the execution team administer a second dose of 5 grams of pentobarbital in the event the prisoner continues breathing after a "sufficient amount of time for death to occur" has passed following administration of the first 5 grams. Otherwise, the Protocol provides no contingency planning for any of the many foreseeable problems the execution is likely to encounter, including trouble establishing and maintaining IV access, problems properly preparing and administering the

26

pentobarbital, clear signs the prisoner is experiencing extraordinary pain and suffering, and other severe complications.

128. The deficiencies in the Protocol and its lack of specificity regarding the details of the execution procedure "significantly increase the already substantial risks of a protracted execution involving severe pain and suffering." Van Norman at 6.

**Issues with Intravenous ("IV") Administration of Pentobarbital**

129. The Protocol calls for execution by intravenous administration of pentobarbital. Setting an intravenous line is a precise procedure that can be complicated and invasive. It requires appropriate and extensive skill, experience, and training.  Ensuring that intravenous access is properly established, functioning, maintained, and monitored is essential and required to ensure an execution by lethal injection will effectively bring about death in a humane and constitutional manner.

130. The execution team has broad discretion in establishing IV access in the condemned prisoner. The Protocol says that "[m]edical personnel," whose qualifications and experience are unknown, "shall determine the most appropriate locations for intravenous (IV) lines" and calls for two IV lines, a primary a secondary, "unless the prisoner's physical condition makes it unduly difficult to insert more than one IV." Execution personnel may choose whether the primary IV is a peripheral line or a central line, "(e.g. femoral, jugular, or subclavian) provided they have the appropriate training, education, and expertise for that procedure." The secondary IV line, if used, must be a peripheral line. Protocol at ¶ C.1.

131. The Protocol lacks sufficient guidance to ensure that intravenous access is properly established and maintained throughout the execution. The Protocol provides insufficient guidance regarding how the execution team determines where and how to set the IVs, including whether to set a peripheral or central line IV and whether to perform a cut-down to access a vein. The Protocol does not provide an order of preferred access sites, a time limit for establishing IV access, or a limit on the number of times the team can attempt IV access. The Protocol contains no requirements regarding the minimum training, experience, or qualifications required for the personnel setting the IVs. The Protocol does not require that the prisoner's unique

27

physical characteristics, including health, medications and medical conditions, or even the viability of his or her veins, be taken into consideration as part of the determination of the appropriate method of venous access.

132. Proper establishment and maintenance of IV access throughout the execution is necessary to ensure that drugs are properly and humanely administered to the prisoner.

133. Improper IV insertion may lead to infiltration or extravasation of the drug, which "causes instant, excruciating pain that patients liken to being set on fire, and requires emergency intervention to reduce extensive tissue damage." Van Norman at 22. Improper seeing of the IV also could lead to injection of pentobarbital into an artery instead of a vein, which would result in "instant arterial spasm, pain, excruciating local tissue destruction, and also immediate ischemia (i.e. lack of oxygen, tissue damage and necrosis) in the area of the body supplied by the artery." *Id.* at 22-23.

134. "[P]lacement of a central line for venous access during judicial lethal injection . . . is fraught with potential mechanical complications, and requires personnel experienced and adept in their placement." In the context of lethal injection executions, the most relevant complications of central line placement "are mechanical complications of line placement that cause vascular injury and inadvertent injection of pentobarbital into surrounding tissues, and failure to deliver all or part of the pentobarbital into the blood stream, leading to prolongation of the execution and excruciating pain." *Id.* at 24.

**Alternatives Relating to Eighth Amendment Issues**

135. In order to establish an Eighth Amendment violation, "a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125(2019).

136. Based on statutory authority, medical science, and upon information and belief, the following alternative methods of execution are both feasible, readily implemented, and available, and would significantly reduce the

substantial risk of severe pain posed by the procedure required by Missouri's Protocol.

a. *Supplement the procedure currently required by the Protocol requiring premedication with an intravenous drug.*

    i. *A general anesthetic.* General anesthetic drugs "cause general anesthesia, which is a state of lowered brain activity resulting in loss of consciousness and inability to feel pain." Stevens at 3. A clinical dose of either propofol or etomidate would be suitable for use as an anesthetic premedication to significantly reduce the risk that a condemned prisoner would experience pain and suffering as a result of the administration of 5 grams of pentobarbital (a "supra-clinical dose"). *Id.* Use of one of these drugs as premedication would be "a necessary medical intervention for a more humane execution process." *Id.* Propofol and etomidate are available, readily implemented and feasible, and their use as a premedication would significantly reduce the substantial risk of severe pain presented by execution with pentobarbital absent premedication. *Id. at* § 3, pp. 2-6 and Table 6; or

    ii. *An opioid analgesic.* Opioids are powerful drugs that "produce selective loss of pain but no loss of consciousness at clinical doses." *Id. at* § 4, p. 7. They relieve pain by inhibiting pain neurons. *Id.* A clinical dose of either propofol or etomidate would be suitable for use as an analgesic premedication to significantly reduce the risk that a condemned prisoner would experience pain and suffering as a result of the administration of 5 grams of pentobarbital (a "supra-clinical dose"). *Id.* Morphine and fentanyl are available, readily implemented and feasible, and their use as a premedication would significantly reduce the substantial risk of severe pain presented by execution with pentobarbital absent premedication. *Id. at* § 4, pp. 7-9 and Table 2.

b. *Supplement the procedure currently required by the Protocol by implementing necessary remedial measures to address the shortcomings of the Protocol*

    i. The Protocol should require selection of trained, qualified, competent and vetted team members; specify the qualifications required for all personnel; and require disclosure of execution team members' qualifications (but not identities);

ii.  The Protocol should require that the execution team establish two patent, functioning peripheral IV lines and should specify (1) that no central line will be placed unless it is determined to be necessary following a vein assessment by a qualified medical professional; and (2) that central lines will be set only by qualified and competent medical professionals;

iii. The Protocol should require that an execution team member administer the pentobarbital to the prisoner in closer proximity to the prisoner, not remotely. Proximate administration, rather than through long IV tubing running from a separate room would significantly reduce the risks of failure due to leakage or pinching of the tubing. The execution team member would be better able to ensure that the drug properly enters the prisoner's circulation, and putting the execution team member close to the prisoner would also ensure improved surveillance and monitoring of the IV, the catheter site and the prisoner. Any and all execution team members who enter the execution chamber could wear surgical caps and masks to conceal their identities; and

iv.  The Protocol should specify a preference for use of manufactured, FDA-approved pentobarbital. If the execution team uses compounded pentobarbital, the Protocol should require that the compounding of the pentobarbital comply with all state and federal compounding requirements and that the finished, compounded pentobarbital has met testing standards for purity and potency, and require disclosure of records of testing, chain of custody and compounding formula to prisoners and their counsel.

## COUNT FIVE: EIGHTH AMENDMENT VIOLATION—CRUEL AND UNUSUAL PUNISHMENT

137. Plaintiff Brian Dorsey incorporates by reference each and every statement and allegation set forth throughout this Complaint as if fully stated herein.

138. The Eighth Amendment forbids the Government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life. *In re Kemmler*, 136 U.S. 436, 447 (1890). "Punishments are cruel when they involve torture or a lingering death … something more than the mere extinguishment of life." *Id.; see also Baze v. Rees, 553 U.S. 35, 50*

*(2008)* (execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

139. Defendants intend to execute Plaintiff in a manner that will inflict excruciating pain on Plaintiff or poses a foreseeable, substantial but avoidable risk of causing severe pain.

140. There are alternative methods of execution, as described above, that are "feasible, readily implemented, and in fact [would] significantly reduce the substantial risk of severe pain." *Baze*, 553 U.S. at 52.

141. Because the Protocol poses a substantial risk of serious harm to Plaintiff, it violates Plaintiff's constitutional right guaranteed by the Eighth Amendment of the U.S. Constitution to be free from arbitrary, capricious, cruel, and unusual punishment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brian Dorsey prays that this Court provide relief as follows:

1. Granting expedited discovery, including ordering the State of Missouri to respond to Plaintiff Dorsey's interrogatories as attached to the Motion for a Preliminary Injunction;

2. A preliminary injunction prohibiting Defendants from executing Plaintiff Dorsey until they can do so in a way that does not violate his rights;

3. A declaratory judgment that MDOC's policy and practice violates Plaintiff Dorsey's First Amendment rights under the Free Exercise Clause;

4. A declaratory judgment that MDOC's policy and practice violates Plaintiff Dorsey's rights under RLUIPA;

5. A declaratory judgment that MDOC's policy and practice violate Plaintiff Dorsey's right to counsel and right of access to the courts under the First, Fifth, Sixth, and Fourteenth Amendments; and

6.  A declaratory judgment that MDOC's policy and practice violate Plaintiff
    Dorsey's Eighth Amendment rights to be free from cruel and unusual
    punishment.

Respectfully submitted this 9th day of February, 2024.

*s/ Arin Melissa Brenner*

**Arin Melissa Brenner #4990974 (NY)**
Ray Kim #319070 (PA)
Assistant Federal Public Defenders
Office of the Federal Public
Defender for Western District of
Pennsylvania, Capital Habeas Unit
1001 Liberty Avenue, Ste 1500
Pittsburgh PA 15222
(412) 644-6565
Email: Arin_Brenner@fd.org
          Ray_Kim@fd.org

*Counsel for Plaintiff*

## CERTIFICATE OF ELECTRONIC SERVICE

I, Arin Melissa Brenner, do hereby certify that I electronically filed the foregoing pleading with the Clerk of the Court for the United States District Court for the Eastern District of Missouri, using the electronic case filing system of the Court on February 9, 2024. I have also served Defendants' counsel of record, Mr. Gregory Goodwin, of the Office of the Attorney General, State of Missouri via e-mail at Gregory.Goodwin@ago.mo.gov.

*s/ Arin Melissa Brenner*

**Arin Melissa Brenner #4990974 (NY)**
Office of the Federal Public
Defender for Western District of
Pennsylvania Capital Habeas Unit
1001 Liberty Avenue, Ste 1500
Pittsburgh PA 15222
(412) 644-6565
Email: Arin_Brenner@fd.org